IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2015 at Nashville

## DONALD WAYNE MCCALL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Crockett County**
**No. 4256     Clayburn Peeples, Judge**

_____

**No. W2015-01171-CCA-R3-PC  -  Filed February 19, 2016**

_____

Donald Wayne McCall ("the Petitioner") filed a Petition for Post-Conviction Relief, alleging ineffective assistance of counsel. Following a hearing, the post-conviction court denied relief. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Justin P. Jones, Brownsville, Tennessee, for the appellant, Donald Wayne McCall.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry G. Brown, District Attorney General; and Hillary Parham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

*Trial*

The Petitioner was convicted of rape of a child and two counts of aggravated sexual battery and sentenced to an effective term of eighty years at 100% service in the Department of Correction. State v. Donald Wayne McCall, No. W2013-01501-CCA-R3-

CD, 2014 WL 2993864, at \*1 (Tenn. Crim. App. June 30, 2014).[1] On direct appeal, this court affirmed the judgments of the trial court. Id.

The underlying facts were recited by this court on direct appeal as follows:

The [Petitioner] was convicted of the rape and aggravated sexual battery of J.M., the [Petitioner]'s niece, and the aggravated sexual battery of K.P., the [Petitioner]'s great niece. At the trial, J.M.'s father, who was also K.P.'s grandfather, testified that on July 4, 2011, he hosted a family gathering at his house. He said that sometime after the July 4 holiday, he saw the [Petitioner], who was his brother, and the victims in the swimming pool. He said that J.M. was sitting on the [Petitioner]'s left leg and that K.P. was sitting on the [Petitioner]'s right leg. He told the victims to get off the [Petitioner] and to swim or to get out of the pool. He said he left the area and began working in the yard. He said he saw the victims and the [Petitioner] alone in the pool once after that day.

On cross-examination, J.M.'s father testified that the first time he saw the [Petitioner] and the victims in the swimming pool was on Saturday after the July 4 holiday. He said that the second time he saw them in the pool was about one week later and that after that day, the victims no longer wanted to swim. He said that when he learned of the allegations, he talked to two county sheriff's deputies, who called Detective Curtis. He said he took J.M. to the hospital to be examined about two or three months after he learned of the allegations. He said that he took J.M. to a woman he identified as Ms. Anita for counseling but that he did not like Ms. Anita's talking to J.M.

J.M. testified that she was born on August 2, 1998, and that she was twelve years old in July 2011. She identified her parents and said that K.P. was her niece and that the [Petitioner] was her uncle, although she had known the [Petitioner] less than one year in July 2011. She said that although she did not recall the date on which the incidents occurred, they occurred after July 4th.

J.M. testified that on the first day she, K.P., and the [Petitioner] were in the swimming pool, they played and splashed the [Petitioner]. She said

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

the [Petitioner] asked them, "You want to know what happens when you splash me?" She said she splashed him again, and the [Petitioner] grabbed her breast. She did not know if K.P. saw the [Petitioner] grab her breast. She said they continued to play and splash the [Petitioner], and he grabbed her breast "most of the time." She thought the [Petitioner] should not have grabbed her there and said he also touched her "crotch area" over her bathing suit. She said the first time the [Petitioner] touched her private area was when she held onto the side of the pool. She said they were playing a game in which she and K.P. held onto the side of the pool, and the [Petitioner] attempted to pull them from the side. She recalled holding onto the side of the pool and the [Petitioner]'s reaching and touching her private area.

J.M. testified that the [Petitioner] also touched her private area when she sat on his knee. She said the [Petitioner] had his hands under the water and touched her and K.P. "down there." She said she saw the [Petitioner] touch K.P. She said that at one point, she put on goggles to determine if the [Petitioner] was touching K.P. She said that before she went under the water with the goggles, she suspected the [Petitioner] was touching K.P. because K.P. yelled, "[I]t was an inappropriate place to touch." She said that the [Petitioner] left the pool to smoke a cigarette and that she and K.P. left a few minutes later. She said that the [Petitioner] asked her if she knew not to tell anyone and that she "nodded her head yes." She said K.P. was a few feet away.

J.M. testified that she and K.P. talked about what happened and discussed whether to report the [Petitioner]'s touching them but that they decided not to tell anyone because they feared J.M.'s father would not believe them. She said that previously, the [Petitioner] told her father that she made a "smart comment" to the [Petitioner], that she denied making the comment, and that her father believed the [Petitioner].

J.M. testified that the following day, the [Petitioner] came to her house to help her father with some repairs. She said that she and K.P. were swimming when the [Petitioner] arrived, that the [Petitioner] entered the pool after he finished helping her father, and that "it happened again." She said the [Petitioner] placed her on his lap and touched her private area with his hand beneath her bathing suit. She said the [Petitioner] inserted his finger into her vagina "a couple of times." She said her father began mowing the yard after he and the [Petitioner] finished the repairs. She did not recall the [Petitioner]'s saying anything during the incident and said

K.P. was on the other side of the pool at the time. She said that the [Petitioner] attempted to place her hand on his crotch a couple of times but that she "jerked" her hand away. She said they all left the pool because it began to rain. She did not see the [Petitioner] touch K.P. that day and said the [Petitioner] drove K.P. home.

J.M. testified that she and K.P. discussed again whether they should tell anyone about the [Petitioner]'s touching them but denied that they discussed the details of what occurred. She said that the following Saturday, the [Petitioner] came to her house to repair her sister's Jeep. She said her mother sent her outside to ask the [Petitioner] a question. She said that she complied and that when she returned, her mother asked why she was hateful to the [Petitioner]. She said her mother stated, "It's not like he's ever touched you or anything like that, right?" She said she broke down, cried, and told her mother what occurred. She said that her mother called her father and that she and her mother calmly walked to the car, left the house, and met K.P. and her mother at the library.

On cross-examination, J.M. testified that she wore a one-piece swimsuit when the incidents occurred. She agreed the incidents occurred on a Wednesday and a Thursday and denied they occurred on a Saturday. Regarding the first incident, she agreed the [Petitioner] first touched her when they were splashing around in the swimming pool. She did not know how many times the [Petitioner] touched her breast and said he touched her private area three or four times. She denied knowing why she and K.P. stayed in the pool that day but said they first thought it was an accident and "freaked out" when the [Petitioner] touched their crotch areas.

J.M. testified that the [Petitioner] wore his "street" clothes in the swimming pool on the second day. She said she and K.P. stayed in the pool because J.M.'s father was outside mowing the lawn and thought the [Petitioner] would stay away from them. She described how the [Petitioner] moved her swimsuit to the side and "put his hand in." When asked why she did not leave, she said she was scared, did not know what to do, and froze. She said she was "pretty sure" the [Petitioner] attempted to put her hand on his crotch area because he pulled her hand to "his crotch area." She said that her hand touched his jeans and that she quickly jerked her hand away. She denied getting into the pool with the [Petitioner] after the incidents occurred.

- 4 -

J.M. testified that she put on the goggles before she and K.P. sat on the [Petitioner]'s knees. She did not know of any incidents involving K.P. after the first day. When confronted with her previous testimony, she denied saying that she and K.P. decided not to tell anyone for any other reason than fearing J.M.'s parents would not believe them. She denied K.P. said "it" did not happen to her. She denied she thought her parents would not believe her because she had been in trouble at school.

J.M. testified that she and K.P. were in the swimming pool a couple of hours each day. She said that K.P. wore shorts over her swimsuit on the first day and that she wore a swimsuit with a skirt attached to it. She said she was not wearing shorts when the [Petitioner] inserted his finger into her vagina but did not recall exactly what she wore. She knew the [Petitioner] touched her first because he had already touched her breast and crotch area before K.P. yelled that the [Petitioner] was being inappropriate. She agreed she told her mother what occurred in October 2011. She said she and K.P. agreed never to talk about the incidents and to attempt to forget what occurred. She said she told her mother what occurred because there was something about the way her mother asked her. She said she liked to write stories, including fantasies.

K.P. testified that she was born on November 24, 1999, that she was eleven years old at the time of the incidents, and that the [Petitioner] was her great uncle. She said that in July 2011, she had known the [Petitioner] for about one year. She said that a few days after July 4, 2011, the [Petitioner] touched her. She said that she, J.M., and the [Petitioner] were in J.M.'s swimming pool when he touched her. She said that the [Petitioner] told her that he was tired from playing in the pool and that although he did not leave the pool, he placed her on his lap. She said J.M. was on the other side of the pool at the time. She said the [Petitioner] touched her crotch area but denied he moved his hands around. She said the [Petitioner] also grabbed her breasts after she splashed him. She denied the [Petitioner] touched her anywhere else that day.

K.P. testified that the [Petitioner] touched her on other occasions but denied that he attempted to make her touch him. She said the [Petitioner] told her not to tell anyone about the touching. She said that after they got out of the pool, the [Petitioner] took her home. She did not recall anyone else being at the house that day.

- 5 -

K.P. testified that the following day, she returned to J.M.'s house and swam in the pool. She said the [Petitioner] touched her breast and crotch area like he did the previous day. She recalled J.M.'s father mowing the lawn when they were in the pool. She said she saw the [Petitioner] touch J.M. when she put on goggles and went underwater, which she did to determine what the [Petitioner] was doing to J.M. She said that she saw the [Petitioner] touch J.M.'s crotch area underneath J.M.'s swimsuit. She said the [Petitioner] told them not to tell anyone about the incident. She denied that she and J.M. talked about the details of the incident but said they discussed if they should tell someone. She said that J.M. wanted to tell someone but that K.P. thought it was an accident. She said she did not want to tell anyone. She stated that she ultimately told her mother about the incidents when her mother asked if the [Petitioner] had ever touched her. She said that after she told her mother what occurred, she and her mother met J.M. and J.M.'s mother at the library.

On cross-examination, K.P. testified that she did not recall whom the [Petitioner] touched first, but she thought he touched her first. She said she and J.M. were sitting on the [Petitioner]'s knees at the same time. She said that they were in the swimming pool for about two or three hours but that it was "almost all day." She clarified that it seemed as though they were in the pool for two or three hours but that it was all day. She said the incident on the first day occurred late in the day. She agreed she did not tell anyone about the incidents and said nothing seemed inappropriate to her.

K.P. testified that at the end of the first day, she and J.M. became hungry and left the swimming pool and that the [Petitioner] remained in the pool. She said they "kind of" got out of the pool because of the [Petitioner]'s touching them. She said the [Petitioner] did not touch her when he drove her home that day. She said that the [Petitioner] was living with her family at the time of the incidents, that they played cards in his room, and that he never touched her when they played cards.

K.P. testified that on the second day, the [Petitioner] was not in the swimming pool when she and J.M. entered the pool. She said the [Petitioner] was at J.M.'s house to assist J.M.'s father repair the lawnmower. She agreed she invited the [Petitioner] to swim with them because she thought his touching them the previous day was an accident. She agreed, though, she used goggles to determine if the [Petitioner] was touching J.M. the same way he was touching her. When presented with her previous testimony, she stated that she did not recall saying she saw the

- 6 -

[Petitioner] touch J.M. when she was wearing goggles underwater, rather than she put on the goggles with the purpose of determining if the [Petitioner] was touching J.M.

K.P. testified that she never got in the swimming pool with the [Petitioner] after the incidents. She said she never told anyone what occurred until her mother approached her about it in October 2011. She denied talking to J.M. in October about the incidents. She agreed she continued to think in October that the touching was accidental. She did not recall her previous testimony in which she stated that the [Petitioner] attempted to make her touch him. She denied her father or J.M.'s father ever swam with her and J.M.

J.M.'s mother, who was K.P.'s step-grandmother, testified that she was home the two days in which J.M. and K.P. swam with the [Petitioner]. She said she first learned of the allegations in October 2011 when the [Petitioner] was at her house repairing a car. She asked J.M. to go outside and ask the [Petitioner] a question related to car parts. She said J.M. did not want to talk to the [Petitioner], although she told J.M. to do it anyway. She said J.M. returned, was upset, and did not want to go outside anymore. She said she was confused and asked J.M. why she was behaving this way. She said that she told J.M., "It's not like he's ever touched you or nothing," and that J.M. began to cry. She said that she asked J.M. if the [Petitioner] had touched her and that J.M. cried. J.M. told her that the [Petitioner] touched her between the legs when J.M.'s mother was inside the house. She said J.M. told her that the [Petitioner] touched K.P., too.

J.M.'s mother testified that she called her husband, who called K.P.'s mother. She denied J.M. and K.P. talked from the time J.M. told her about the allegations to K.P.'s telling her mother about the allegations. She said that after she and J.M. met K.P. and her mother at the library, they went to the police station. She said that after the July 4 holiday, J.M. was different when the [Petitioner] came to her house. She said that anytime the [Petitioner] came to their house, J.M. put on long sleeves and pants. She said J.M. refused to swim, although she loved swimming, and disrespected the [Petitioner].

On cross-examination, J.M.'s mother testified that she convinced J.M. to go swimming with her once after the incidents occurred. She said she equated J.M.'s changing her clothes when the [Petitioner] was at their house and her disrespect toward the [Petitioner] to J.M.'s adolescent

attitude. She agreed J.M. and K.P. talked to her after their trial testimony but denied discussing the substance of their testimony. She said that she recalled walking outside the house during the relevant days and that she thought J.M., K.P., and the [Petitioner] were having a good time. Although she could not recall whether it was the first or second day, she said J.M. entered the house and stated she was done with swimming.

Upon this proof, the [Petitioner] was convicted of rape of a child of J.M., aggravated sexual battery of J.M., and aggravated sexual battery of K.P. The trial court sentenced the [Petitioner] as a Range II, multiple offender to forty years for the child rape conviction and to twenty years for each aggravated sexual battery conviction. The court ordered consecutive sentences, for an effective eighty-year sentence at 100% service.

Id. at *1-5.

*Post-Conviction Proceedings*

The Petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. Although the Petitioner raised numerous allegations of ineffective assistance of counsel in his petitions, on appeal he limits himself to arguing that counsel was ineffective for: (1) failing to confer adequately with the Petitioner regarding trial preparation; (2) failing to call two witnesses requested by the Petitioner; (3) refusing to allow the Petitioner to testify; (4) failing to provide the Petitioner with discovery; and (5) failing to file pre-trial motions.[2] The State argues that the post-conviction court properly found that the Petitioner failed to establish either deficient performance or prejudice.

The Petitioner testified that he was incarcerated in the Crockett County Jail before trial. He stated his counsel would come to see him "almost every time just before docket call before we had to come to [c]ourt" but that "mostly all he wanted to talk about was a plea agreement." He estimated that his attorney came to see him four to five times. The offer tendered by the State was for him to plead guilty to two counts of sexual battery in return for a sixteen-year sentence. He stated he received no discovery from his counsel. Although the testimony of the Petitioner is confusing, the Petitioner appears to claim that counsel had a copy of a protective order concerning a forensic interview conducted by the

---

[2] The Petitioner was initially represented by the public defender, who filed a motion for discovery. After discovering a conflict, the public defender was allowed to withdraw and trial counsel was appointed.

Department of Children's Services (DCS) but that the Petitioner was never able to view the forensic interview file or to read a transcript of the interview.[3]

The Petitioner said he provided his attorney with the names of two witnesses, Josh and Jennifer Potts, both of whom had been subpoenaed by the State. The Petitioner wanted them called as witnesses to testify that J.M. had lied to her father in the past "to get out of trouble at school[.]" We note from the direct appeal record that J.M.'s father testified at the trial and that he was not asked about the allegations that J.M. had lied to him to get out of trouble. Petitioner also requested trial counsel to obtain the school records of J.M. Although his trial counsel was able to get a copy of the school records shortly before trial, he was precluded from introducing them by the trial court. The Petitioner claimed he told trial counsel about the records a month before trial but that trial counsel did not get them until a few days before trial. The Petitioner claimed if trial counsel had gotten the records earlier that he may have been able to have them admitted as evidence. The Petitioner testified that his attorney failed to file a motion for discovery and therefore failed to get exculpatory evidence from the State that would have shown the discrepancies in the victims' allegations.

The Petitioner said he and his attorney did not discuss the State's evidence or trial strategies. He claimed he told trial counsel "from day one" that he wanted to testify and that after the State completed its proof, that he again told trial counsel during the court recess that he wanted to testify. The Petitioner stated that when court reconvened, trial counsel and the assistant district attorneys approached the bench and talked to the judge and that when trial counsel came back to the table, he asked: "Well, am I going to testify[?]" The Petitioner said "[trial counsel] looked at me and he said 'You're not.'" He said he wanted to testify to show a motive for the victims making up the allegations. He said he had previously seen pictures posted on J.M.'s Facebook and that the day before the allegations were made, he stopped by J.M.'s father's house and told J.M. that he had "found another one of them pictures on your Facebook" and "I'm gonna [sic] tell your dad tomorrow evening." He said J.M. and K.P. went around to the back of the house, and the next morning the allegations were made.

Trial counsel testified that he received information from the State concerning what the testimony of Mr. and Ms. Potts was expected to be if they were called to testify. He stated that the testimony that the Petitioner wanted to illicit from Mr. and Ms. Potts was hearsay. Trial counsel said he was provided "open file access" to the State's file and the

---

[3] The transcript of the Petitioner's testimony states, "I received [from trial counsel] a [sic] Order of Protection against forensic interview telling me that I could not have a copy of it, but I was supposed to be allowed to review it, which I never looked at."

file of the State's investigator. He said he met with the Petitioner in an office at the jail and showed him everything he had obtained through discovery. He said the Petitioner read the reports and that he discussed the protective order with the Petitioner. He said they discussed the strengths and weaknesses of the case. He explained that "the similarity in the stories these two girls were telling and how typically an honest off-the-cuff story doesn't tend to be so exact between two people." Trial counsel stated that his strategy was to point out how the two stories were too identical and argue that, coupled with the lack of physical evidence, the jury should find that they were fabricated.

Trial counsel obtained records from DCS and, after the trial court performed an in camera review, he reviewed the records. He sought to introduce the DCS records as an exhibit, but the trial court refused to allow admission. The State had filed a notice of intent to impeach the Petitioner with his prior convictions, and trial counsel did not want the Petitioner to testify because that would open the door for the State to introduce his significant criminal history.[4] Trial counsel testified that, although he recommended that the Petitioner not testify, he advised the Petitioner that it was the Petitioner's decision whether to testify, and the Petitioner said "well, you're the attorney."[5] When the State ended its proof, trial counsel announced that the Petitioner did not intend call any witnesses, and the Petitioner "huffed." Trial counsel said he knew of no exculpatory evidence withheld by the State. Trial counsel stated that, based on his investigation, the testimony of Mr. and Ms. Potts would not have been favorable to the Petitioner.

Following argument of counsel, the post-conviction court orally ruled on the petition. The court found that trial counsel's defense strategy was "by far the very best strategy that could have been employed in this particular case"; that trial counsel had made "all pre-trial motion[s] that should have been made"; that "there was ample communication between [trial counsel] and [the Petitioner]"; that trial counsel and the Petitioner met to discuss strategy; and that trial counsel had preserved all possible issues for appeal. Additionally, the post-conviction court noted that the Petitioner had not offered any proof that the testimony of Mr. and Ms. Potts's would have been material or admissible. The post-conviction court also stated that trial counsel's recollection of his advice about the Petitioner's right to testify was "not only completely believable, but consistent with what happened at the trial, and also appears to have been excellent advice, which [the Petitioner] at the time took." Further, the post-conviction court found that trial counsel never told the Petitioner he could not testify. In sum, the post-conviction

---

[4] The notice filed by the State is an exhibit and is in the technical record of the direct appeal. The notice lists six class E felony convictions for various offenses and one class A felony conviction for second degree murder. One of the E felony convictions was for sexual battery, and it was determined before trial that that conviction could not be used by the State to impeach the Petitioner.

[5] The direct appeal record does not contain a transcript of any <u>Momon</u> hearing.

court held that "[trial counsel's] actions not only met but exceeded the requirements of effective representation, not only in this area by in any area of the country."

The post-conviction court then denied relief on the petition. This timely appeal followed.

<u>**Analysis**</u>

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. <u>Jaco v. State</u>, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. <u>See</u> <u>Fields v. State</u>, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. <u>Id.</u> (citing Tenn. R. App. P. 13(d); <u>Henley v. State</u>, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. <u>Kendrick v. State</u>, 454 S.W.3d 450, 457 (Tenn. 2015).

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." <u>Fields</u>, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." <u>Id.</u> (citing <u>Henley</u>, 960 S.W.2d at 579); <u>see also</u> <u>Kendrick</u>, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>State v. Taylor</u>, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. <u>Strickland</u>, 466 U.S. at 687; <u>Henley</u>, 960 S.W.2d at 580; <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. <u>Finch v. State</u>, 226 S.W.3d 307, 316 (Tenn. 2007) (citing <u>Carpenter v. State</u>, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

- 11 -

Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to Adequately Communicate and Prepare for Trial*

On appeal, the Petitioner contends that trial counsel was ineffective because he failed to adequately communicate with the Petitioner and prepare for trial. The Petitioner testified that trial counsel met with him four or five times while he was incarcerated. Trial counsel used the State's offer for open file discovery to find out what evidence the State had against the Petitioner, obtained school records and the DCS records, and formulated a trial strategy. Trial counsel testified that he discussed the State's evidence and explained the trial strategy to the Petitioner on several occasions. The post-conviction court found there was ample communication between counsel and the Petitioner. The post-conviction court implicitly accredited trial counsel's testimony, stating that it found trial counsel's "testimony was believable and consistent with what happened at trial." The Petitioner has failed to prove that trial counsel was deficient in either communicating with him or in his trial preparation.

### *Failure to Call Two Witnesses Requested by the Petitioner*

The Petitioner requested that trial counsel call Mr. and Mrs. Potts to impeach the credibility of the victims. Trial counsel determined that the testimony the Petitioner

wanted to illicit from the witnesses would have been inadmissible as hearsay and that their testimony otherwise would have been unfavorable to the Petitioner. However, neither Mr. Potts nor Ms. Potts testified at the post-conviction hearing. In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner must present such witness at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial nor an appellate judge can speculate as to whether that witness's testimony would have been favorable to the defense. Id. Therefore, the petitioner must "produce a material witness who . . . would have testified favorably in support of his defense if called [at trial]. Otherwise, the petitioner fails to establish the prejudice requirement mandated by Strickland v. Washington." Id. at 758. Because neither of the witnesses testified at the post-conviction hearing, the Petitioner has failed to show that he was prejudiced by the failure of trial counsel to call the two witnesses. See id. at 757-58. The Petitioner is not entitled to relief on this ground.

*Refusal to Allow the Petitioner to Testify*

The Petitioner claims trial counsel refused to allow him to testify. Trial counsel testified that the State would be allowed to present evidence of the Petitioner's extensive criminal record, and he believed such evidence would undermine the Petitioner's credibility and jeopardize the defense strategy. Trial counsel therefore recommended that the Petitioner not testify but still advised the Petitioner that the decision rested with the Petitioner. Trial counsel said the Petitioner decided not to testify. The post-conviction court found the testimony of trial counsel credible and noted that trial counsel gave "excellent advice." We are bound by the post-conviction court's findings of fact and judgments of credibility. Fields, 40 S.W.3d at 456. Therefore, we conclude that the Petitioner has failed to show that trial counsel refused to allow the Petitioner to testify.

*Failure to Conduct a Momon Hearing*

Although not raised by the Petitioner in either this appeal or in the direct appeal, we note that there was no Momon hearing conducted on the record during the trial of this case. See Momon v. State, 18 S.W.3d 152 (Tenn.1999). Because defendants have a constitutional right to testify, the right must be personally waived by the defendant. Id. at 163. Therefore, pursuant to Momon, trial counsel should have requested that the trial court allow him to question the Petitioner in order to ascertain whether the Petitioner knowingly, voluntarily, and intelligently waived his right to testify. See id. at 162-63. Furthermore, a trial court bears the responsibility to "require" that a hearing be conducted pursuant to the procedure outlined in Moman. Id. at 162. This court has previously determined that "the failure to conduct a hearing pursuant to Momon to determine

- 13 -

whether the Defendant did personally waive his right to testify was plain error." <u>State v. Posey</u>, 99 S.W.3d 141, 148 (Tenn. Crim. App 2002).

The Petitioner had the opportunity, personally or through counsel, to present the failure to conduct a <u>Momon</u> hearing at trial, on direct appeal, and in this proceeding but failed to do so. The Petitioner has waived a free-standing <u>Momon</u> claim in the post-conviction proceedings by failing to raise the issue at trial or on direct appeal. Tenn. Code Ann. § 40-30-106(g); Tenn. Sup. Ct. R. 28, § 2(D); <u>Miqwon Deon Leach v. State</u>, No. W2004-01702-CCA-R3-PC, 2005 WL 1651654, at *7 (Tenn. Crim. App. July 14, 2005), <u>perm. app. denied</u> (Tenn. Dec. 5, 2005). However, we will address the issue of whether trial counsel rendered ineffective assistance by failing to conduct a <u>Momon</u> hearing. <u>See</u> <u>Miqwon Deon Leach</u>, 2005 WL 1651654, at *7. "When a petitioner argues that his trial counsel's assistance was ineffective based on <u>Momon</u> violations, he or she must establish that his counsel's performance fell below 'the range of competence demanded of attorneys in criminal cases,' and that counsel's ineffective performance actually adversely impacted his defense." <u>Id.</u> at *8 (citing <u>Strickland</u>, 466 U.S. at 693; <u>Baxter</u> 523 S.W.2d at 936); <u>see also</u> <u>Mario Deangalo Thomas v. State</u>, No. W2004-01704-CCA-R3-PC, 2005 WL 1669898, at * 3-4 (Tenn. Crim. App. July 18, 2005), <u>perm. app. denied</u> (Tenn. Dec. 5, 2005).

Trial counsel's failure to follow the well-established procedure for conducting a <u>Momon</u> hearing was deficient performance. <u>See</u> <u>Miqwon Deon Leach</u>, 2005 WL 1651654, at *8 (concluding "that trial counsel's failure to follow what was by the time of Petitioner's trial a well-established procedure was deficient performance"). However, the Petitioner has failed to show that he was prejudiced by trial counsel's failure to conduct a <u>Momon</u> hearing. The Petitioner stated at the post-conviction hearing that he wanted to testify about the victims' motives to fabricate the allegations. The trial strategy of the defense had been to attempt to show the victims' statements were so identical that they were contrived. From this standpoint, the Petitioner's testimony could have possibly bolstered the defense. However, if the Petitioner testified, the State would have presented proof of six prior felony convictions, including two petty larcenies, an escape from jail, and second degree murder. The risk of substantial damage to the Petitioner's credibility was great. Additionally, trial counsel testified at the post-conviction hearing that he discussed with the Petitioner the possible benefits and dangers of the Petitioner testifying. After trial counsel's motion to exclude some of the Petitioner's prior convictions was denied, trial counsel met with the Petitioner and explained that the State could "use the fact that you've been in jail essentially all of your adult life for one crime or another, including murder, to attack your credibility." Trial counsel advised the Petitioner that in his opinion "you run a stronger risk of doing more harm than good if you testify." After explaining that the Petitioner had to decide whether to testify, the Petitioner stated "[w]ell you're the attorney," thereby choosing not to testify. Therefore, this case, like <u>Mario</u>

Deangelo Thomas, is distinguishable from Posey. See Mario Deangelo Thomas, 2005 WL 1669898, at *3. In Posey, there was no proof in the record that the defendant knowingly and voluntarily waived his right to testify. Id. Conversely, in Mario Deangelo Thomas this court noted that Mr. Thomas's trial counsel testified "that the defendant made an informed decision not to testify[,]" and the post-conviction court credited that testimony. Id. This court stated "[t]hus, the failure to conduct a Momon hearing in this case is mere procedural error that does not 'in and of itself support a claim for deprivation of the constitutional right to testify.'" Id. As stated above, in this case, trial counsel advised the Petitioner that he could do more harm than good if he chose to testify and the Petitioner responded, "Well, you're the attorney." Therefore, we conclude that the Petitioner has failed to show by clear and convincing evidence that trial counsel's failure to conduct a Momon hearing adversely impacted his defense or deprived him of the constitutional right to testify. See Miqwon Deon Leach, 2005 WL 1651654, at *8 (citing Strickland, 466 U.S. at 693). The Petitioner is not entitled to relief on this issue.

*Failure to Provide the Petitioner with Discovery*

Trial counsel testified that he had open file discovery with the State and that he took documents to the Petitioner to read and discuss. Trial counsel testified that he obtained school records and DCS records concerning the victims but that he was denied being allowed to admit them by the trial court. The post-conviction court credited the testimony of trial counsel. Additionally, the post-conviction court found that "there was ample communication between [trial counsel] and [the Petitioner.]" The Petitioner has failed to prove trial counsel's representation was deficient for failing to provide discovery. He is not entitled to relief on this issue.

*Failure to File Pretrial Motions*

The Petitioner claims that trial counsel failed to file a pretrial motion for discovery and by doing so failed to discover exculpatory evidence. Trial counsel testified he was provided open file discovery and that he was unaware of any exculpatory evidence. Further, the Petitioner did not present any exculpatory evidence at the post-conviction hearing. See Black, 794 S.W.2d at 757-58. The Petitioner failed to show that trial counsel's pre-trial representation was deficient or that he was prejudiced, and he is entitled to no relief on this issue.

- 15 -

## <u>Conclusion</u>

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE